IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 12-81311-CIV-MIDDLEBROOKS/BRANNON

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | CASE NO. 9:12-CV-81311-DMM |
| Plaintiff, | |
| v. | |
| HUNTER WISE COMMODITIES, LLC, *et al.*, | |
| Defendants. _____/ | |
| Melanie E. Damian, as Receiver of Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, And Hunter Wise Trading, LLC, | ANCILLARY CASE NO. _____ |
| Plaintiff, | |
| v. | |
| Bullion Investment Corporation and Robert Roca, | |
| Defendants. _____/ | |

# COMPLAINT

Plaintiff, Melanie E. Damian, in her capacity as the Court-appointed Receiver ("Plaintiff" or the "Receiver") for Hunter Wise Commodities, LLC ("HW Commodities"), Hunter Wise Services, LLC ("HW Services"), Hunter Wise Credit, LLC ("HW Credit"), and Hunter Wise Trading, LLC ("HW Trading") (collectively, the "HW Entities"), files this Complaint stating claims for fraudulent transfers and unjust enrichment against Defendants Bullion Investment Corporation and Robert Roca (collectively "Defendants") and states as follows:

## THE PARTIES

### The Receiver

1. On February 22, 2013, the United States District Court for the Southern District of Florida (the "Receivership Court") appointed Plaintiff as the Special Monitor and Corporate Manager of the HW Entities and other entity defendants in the action styled *United States Commodity Future Trading Commission v. Hunter Wise Commodities, LLC, et al.*, Case No. 12-81311-CIV-Middlebrooks (the "Receivership Action"). *See* Receivership Action, ECF # 77 (the "Appointment Order").

2. On February 24, 2013, the Receivership Court further defined and expanded Plaintiff's powers, duties and responsibilities in its Order on Plaintiff's Motion for Preliminary Injunction (the "Preliminary Injunction"). *See id.,* ECF #78.

3. On May 16, 2014, the Receivership Court entered its Order of Final Judgment, Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief (the "Final Judgment"), which, among other things, granted Plaintiff "full authority to act as an Equity Receiver for the Hunter Wise entity defendants." *See id.,* ECF #306.

### The Defendants

4. At all times material hereto, Defendant Bullion Investment Corporation was organized under the laws of the State of Florida, and conducted business with the HW Entities, which conducted business, and obtained funds from customers who reside, in the Southern District of Florida, California and other jurisdictions.

5. At all times material hereto, Defendant Robert Roca was a resident of the State of Florida who served as the President of and managed the operations of Defendant Bullion Investment Corporation including its transactions with the HW Entities.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, Section 754, and the principles of ancillary or supplemental jurisdiction under Title 28, United States Code, Section 1367.

7. This Complaint is brought to accomplish the ends sought and directed by the District Court in the Receivership Action, which, among other things, appointed Plaintiff as Special Monitor, Corporate Manager and Equity Receiver and authorized her to commence actions to recover assets of the Receivership Estate. This action is related to the claims in the Receivership Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a).

8. This Court has personal jurisdiction over Defendant pursuant to Title 28, United States Code, Sections 754 and 1692. Plaintiff was appointed as Equity Receiver in this District; the instant Complaint is brought to accomplish the objectives of the Appointment Order, the Preliminary Injunction and the Final Judgment; and the property sought by Plaintiff is located in multiple districts. Plaintiff has complied with the requirements of Sections 754 and 1692.

9. This Court also has personal jurisdiction over Defendants because Defendants are Florida residents, who received funds from the HW Entities, which were operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida. The transfers that Defendants received from the HW Entities were proceeds from the HW Entities' fraudulent scheme.

10. Venue is also proper in the Southern District of Florida pursuant to Title 28, United States Code, Sections 754 and 1692, because this action is brought to accomplish the objectives of the Appointment Order, the Preliminary Injunction and the Final Judgment and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, certain of the acts described in this Complaint occurred in the Southern District of Florida, and victims of the HW Entities' fraudulent scheme were located in the Southern District of Florida.

## THE RECEIVER'S STANDING
## TO BRING THE CLAIMS ASSERTED HEREIN

11. The Receiver has standing to bring these claims pursuant to the Court's Appointment Order and Final Judgment [Receivership Action, ECF # 77 and 306, respectively]. The Appointment Order specifically requires the Receiver "[t]o take exclusive custody, control and possession of all funds, property, and other assets in the possession of, or under the control of [the Entity Defendants]." *See* Receivership Action, ECF #77 at ¶ 21.A. The Appointment Order also grants the Receiver full power "to sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys, effects, lands, leases, books, records, work papers, and records of accounts…." *Id*. The Appointment Order further provides that the Receiver is directed and authorized "to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in any state, federal or foreign jurisdiction as necessary to carry out the duties pursuant to [the Appointment] Order." *Id*. at ¶ 21.G.

12. The Receiver also has standing to bring this action pursuant to Title 28, United States Code, Section 754, which provides that "[a] receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof [and] shall have capacity to sue in any district without ancillary

4

appointment[.]" As set forth above, the Receiver has complied with the requirements set forth in Title 28, United States Code, Sections 754 and 1692.

13. Further, the Receiver, standing in the HW Entities' shoes, has legal claims as a "creditor" of the HW Entities, as defined by the California Uniform Fraudulent Transfer Act Ann. Cal. Civ. Code §§ 3439.01, *et seq*.

## FACTUAL ALLEGATIONS

### The HW Entities

14. HW Commodities, LLC originally was organized in 2007 as a California limited liability company. In January 2010, HW Commodities converted to a Nevada limited liability company but continued to run its operations from its headquarters in Irvine, California. HW Commodities held itself out as "a physical commodity trading company, wholesaler, market maker, back-office support service provider, and finance company" that offers off-exchange financed commodity trading in physical metals.

15. At all times material hereto, HW Services, HW Credit, and HW Trading were wholly owned subsidiaries of HW Commodities. HW Credit and HW Trading are Nevada limited liability companies, and HW Services is a California limited liability company. Together, the HW Entities operated as a common enterprise under common ownership and control from their headquarters in Irvine, California.

16. At all times material hereto, Defendant Bullion Investment Corporation was a retail dealer working to solicit customers and execute financed transactions with the HW Entities.

17. At all times material hereto, Defendant Roca was the President and shareholder of Defendant Bullion Investment Corporation in charge of its operations, soliciting customers on its

behalf and responsible for carrying out the transactions between Bullion Investment Corporation and the HW Entities.

18. Defendant Roca was also a subsequent transferee of the Transfers initially transferred from the HW Entities to Defendant Bullion Investment Corporation.

**Overview of the HW Entities' Fraudulent Scheme**

19. The HW Entities offered retail customers two types of transactions: (1) the purchase or sale of physical precious metals, and (2) off-exchange trading of gold, silver, platinum, palladium, and copper on a leveraged, margined or financed basis. In the latter transactions, the retail customers were led to believe that they purchased physical commodities and paid only a portion of the purchase price and financed the balance of the purchase price. These types of "financed" transactions constituted the vast majority of the HW Entities' business.

20. The HW Entities used a network of retail dealers and telemarketing firms (collectively, the "dealers"), like Defendant Bullion Investment Corporation, many of which were located in South Florida, to solicit retail customers and execute financed transactions with the HW Entities. The HW Entities also used an intermediary entity, Lloyds Commodities, LLC ("Lloyds"), located in Palm Beach Gardens, Florida, to execute financed transactions between the dealers and the HW Entities. Lloyds functioned principally to accept orders and funds from dealers on behalf of customers and to transmit the orders and funds to the HW Entities. Generally, the customers entered into agreements with their dealers, and the dealers entered into agreements either with HW Commodities or with Lloyds or both. These agreements governed the customers' purchases and sales of the precious metals, as well as the financing and data processing service, and were an integral part of the HW Entities' scheme.

21. The HW Entities and their dealers' marketing materials and websites misrepresented that (1) retail customers could purchase physical commodities, including gold, silver, copper, platinum, and palladium, by paying as little as 20-25% of the purchase price; (2) the dealers would lend the customers the remaining portion of the purchase price and charge the customer interest on the loan; (3) the customer would receive title to the physical commodities after the financed purchase; and (4) the dealers would store the physical commodities at an independent depository on the customers' behalf and customers would be charged a "storage fee".

22. After signing account agreements with the dealers, the end customers would place either long (buy) or short (sell) trades to speculate on the price movement of metals. Once the customers agreed to place orders to purchase or sell metals, the dealers contacted the HW Entities or Lloyds, which would then contact the HW Entities, to enter the trades for the customers. The dealers then collected the customer funds and sent them to the HW Entities or to Lloyds, which would forward the funds to the HW Entities.

23. Customers were charged a commission, a price spread (a mark-up or mark-down from the current price of the metals), interest on the purported loan, and other fees until the long or short trading position was offset. The HW Entities would compensate the dealers and Lloyds with a portion of the fees and charges paid by the customers for the transactions.

24. The customers' equity increased or decreased as prices of metals fluctuated, while also subject to depletion on a daily basis by interest and service fees. When customers' equity fell below 15% of the value of their total trading position, the customers received margin calls, requiring the customers to deposit additional funds in order to maintain their trading positions. If the customers' equity dropped to 9%, any open trading positions were liquidated and the customers would generally lose their entire investments.

25. The overwhelming majority of the HW Entities' end customers who entered into financed transactions with the HW Entities, through the dealers or Lloyds, lost money as a result of those transactions, and those losses were compounded by the high commissions and fees that the HW Entities charged. Neither the HW Entities nor its dealers or Lloyds disclosed those losses to customers when soliciting them to open new accounts. Many of the end customers who were victims of the HW Entities' scheme were located in South Florida.

**The Dodd-Frank Act**

26. On July 16, 2011, Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") went into effect. The Dodd-Frank Act broadened the scope of the Commodity Future Trading Commission's ("CFTC") jurisdiction to include financed commodity transactions with retail customers. Specifically, this broadened jurisdiction required that such transactions be executed on an exchange and subjected these transactions to anti-fraud provisions as set forth in Sections 4(a) and 4(b) of the Commodity Exchange Act (the "CEA"), as amended by the Dodd-Frank Act (*see* 7 U.S.C. §§ 2(c)(2)(D), 6(a), 6b, 9, and 15), and the CFTC's regulations promulgated thereunder (*see* 17 C.F.R. §§ 1.1, *et seq*. (2012)). In addition, effective August 15, 2011, Section 753 of the Dodd-Frank Act amended Section 6(c) of the CEA, 7 U.S.C. §§ 9 and 15, broadening the CFTC's anti-fraud jurisdiction as set out in 17 C.F.R. § 180.1.

27. The Dodd-Frank Act amendments to the CEA require that commodity transactions with individual consumers (like the end customers here) on a leveraged or margined basis or financed by the offeror (like the financed transactions engaged in by the HW Entities) must be done on a regulated commodity exchange. The Dodd-Frank Act allows for exceptions to this requirement if the financed commodities, here the precious metals, are actually delivered to the end customer within twenty-eight (28) days of the transaction or if the applicable contract

creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery. *See* 7 U.S.C. § 2(c)(2)(D).

**The HW Entities' Violations of the Dodd-Frank Act**

28. The HW Entities claimed to supply physical metals to, and provide financing for, financed metals transactions marketed by their dealers. The HW Entities, however, did not generally buy, sell, loan, store, or transfer physical metals in connection with financed metals transactions. Instead, the HW Entities recorded and tracked customer orders and trading positions, and then managed its exposure to those retail customer's trading positions by trading derivatives, such as futures, forwards, and rolling spot contracts in its own margin trading accounts.

29. The HW Entities allowed customers to take "long" trading positions through purported purchases of metals, and "short" trading positions through what it called "commodity loans." When it received an order and the necessary customer funds from a dealer or Lloyds, the HW Entities made a book entry in a database reflecting the retail customer's transaction.

30. The HW Entities would aggregate the funds it received from the dealers and Lloyds and deposit those funds in its own bank accounts. The HW Entities then deposited a portion of those funds in margin trading accounts in the name of a HW Entity with a precious metals supplier or trading institution with which the HW Entities had signed trading account agreements on behalf of the HW Entities.

31. At no time during the relevant period at issue in this Complaint did the HW Entities have an inventory of physical precious metals that it sold or loaned to customers in connection with financed metals transactions. The HW Entities did not (with few exceptions) pay in full for the purchase of commodities through its margin trading accounts. Instead, the HW Entities deposited funds with the metals suppliers or trading institutions as margin in order

to trade metals futures or forward contracts on their own behalf. The HW Entities traded in their margin accounts to manage their exposure to customer orders.

32. The HW Entities' trading in their margin accounts did not involve the shipment, receipt, or storage of physical metals. The trading institutions with which the HW Entities placed their margin trades did not actually deliver any physical commodities to the HW Entities.

33. The HW Entities did not own, possess, or have title to any metals as a result of its margin trades, and neither did the HW Entities' customers. Any invested equity that the HW Entities did have in trading accounts was never assigned to specific end customers nor to their dealers.

34. The HW Entities did not actually deliver any physical commodities to any of its intermediaries (including but not limited to Lloyds), dealers, or any end customers in connection with financed commodity transactions.

35. As a result of the above-described business model, put in place, operated, and overseen by the HW Entities, the HW Entities operated in violation of the Dodd-Frank Act. Further, the HW Entities' equity derived from its business operations was highly leveraged.

**The CFTC Enforcement Action**

36. On December 5, 2012, the CFTC filed a complaint against the HW Entities and related entities including dealers of the HW Entities and their principals, for injunctive and other equitable relief and penalties under the CEA and the Dodd-Frank Act, alleging, among other things, that the HW Entities offered and executed transactions for the purchase and sale of precious metals in violation of those Acts. *See* Receivership Action, ECF #1.

37. That same day, the CFTC also filed a Motion for Preliminary Injunction, seeking to enjoin the HW Entities, Mr. Martin, Mr. Jager, and related entities including dealers of the

HW Entities and their principals, from continuing their operations and further violations of the CEA and the Dodd-Frank Act, and the appointment of a receiver. *See id.*, ECF #4.

38. On February 22, 2013, following a hearing on the CFTC's Motion for Preliminary Injunction, the Receivership Court entered the Appointment Order.

39. On February 25, 2013, the Receivership Court entered the Injunction Order.

40. Subsequently, Mr. Martin and Mr. Jager appealed the Receivership Court's Injunction Order.

41. On February 19, 2014, the Receivership Court entered its Order on the Parties' Motions for Summary Judgment, granting the CFTC's Motion for Summary Judgment on Count One of its complaint, determining that the HW Entities, Mr. Martin, Mr. Jager, and certain other defendants violated certain sections of the CEA and the Dodd-Frank Act, and on Count Twelve, determining that the HW Entities failed to register as Futures Commission Merchants in violation of those Acts, and denying the defendants' Counter Motion for Summary Judgment on all Counts of the CFTC's complaint. *See id.*, ECF #281.

42. On April 15, 2014, the United States Court of Appeals for the Eleventh Circuit entered its opinion affirming the Receivership Court's Injunction Order. *See* 749 F.3d 967 (2014).

43. On May 16, 2014, after a trial on the remaining Counts of the CFTC complaint, the Receivership Court entered an Opinion and Order in which the Court, among other things, found that the HW Entities "misrepresented facts about the precious metals transactions it oversaw… [and] directly and indirectly led the retail customers to believe metals were stored on their behalf." *See* Receivership Action, ECF #303 at p.31 (as amended on May 22, 2014 at ECF #308). The Court further found that [the HW Entities] failed to inform [retail customers] that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there

11

were any at all, were not in the retail customers' names." *Id*.  Accordingly, the Receivership Court held that the CFTC established by a preponderance of evidence that the HW entities, Mr. Martin and Mr. Jager committed fraud and aided and abetted the Lloyds entity defendants and the dealer defendants in defrauding the end customers, in violation of the CEA, the Dodd-Frank Act, and the CFTC's regulations promulgated thereunder.  *See id.*, ECF # 303.

44. Also on May 16, 2014, the Receivership Court entered its Order of Final Judgment, Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief (the "Final Judgment"), which, among other things, ordered the HW entities and their principals Harold Edward Martin, Jr. and Fred Jager, jointly and severally, to pay restitution in the amount of $52,643,399.19 and a civil monetary penalty in the amount of $55,445,892.39 (which represents triple their monetary gain as a result of their wrongdoing).  *See id.,* ECF #306 at pp. 4 and 7.

45. No party appealed the Receivership Court's Opinion and Order or Final Judgment.

### The Insolvency of the HW Entities

46. As a result of operating a fraudulent scheme, the HW Entities were insolvent, undercapitalized, and operating at a loss.  From inception, the HW Entities did not have sufficient assets to pay their debts to customers and creditors as those debts became due.

### Transfers to Defendants

47. From August 11, 2011 to February 11, 2013, HW Credit transferred funds in the amount of $1,107,630.80 (collectively, the "Transfers") to Defendant Bullion Investment Corporation.  The Transfers originated from HW Credit's bank accounts located in California. *See* Summary of Disbursements, attached hereto as **Exhibit A**.

48. The Transfers were made in a series of eighty-two (82) transfers from HW Credit to Defendant Bullion Investment Corporation.

49. Upon information and belief, Defendant Bullion Investment Corporation subsequently made transfers of these funds to its President and shareholder, Defendant Roca.

50. The funds comprising the Transfers to the Defendants were funds that HW Credit fraudulently obtained from customers.

51. Defendants solicited these defrauded customers and received the Transfers as commissions, interest, price mark-ups or mark-downs and other fees, without providing reasonably equivalent value in exchange for those Transfers.

52. The HW Entities, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Transfers made to Defendants as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer and investor funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

53. Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated, or lost from the HW Entities as a result of the fraudulent transfers to, and unjust enrichment of, Defendants.

54. All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

55. This action is brought within the pertinent statutory limitations period.

56. Given that HW Credit and the other HW Entities, were all operated from their headquarters in Irvine, California, the transactions with Defendants were carried out in California and the Transfers came from bank accounts located in California, California law applies to the claims brought herein.

## CLAIMS FOR RELIEF

## COUNT I

## AGAINST ALL DEFENDANTS

**(Fraudulent Transfer under Ann. Cal. Civ. Code, § 3439.04(a)(1)
and California Common Law Fraudulent Conveyance)**

57. Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58. This is a claim to avoid and recover a fraudulent transfer pursuant to Ann. Cal. Civ. Code, § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyance.

59. As detailed above, HW Credit transferred $1,107,630.80 to Defendant Bullion Investment Corporation.

60. Defendant Bullion Investment Corporation received the $1,107,630.80 from HW Credit without providing reasonably equivalent value in exchange for the Transfers.

61. At the time that HW Credit made the Transfers, it was operating a fraudulent scheme, was insolvent, and was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

62. When HW Credit made the Transfers to Defendant Bullion Investment Corporation, HW Credit intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.

63. Thus, HW Credit had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud creditors. Consequently, the Transfers were inherently fraudulent pursuant to Ann. Cal. Civ. Code, § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyance.

64. Upon information and belief, Defendant Bullion Investment Corporation subsequently transferred all or some of the Transfers to its President and shareholder Defendant Roca.

65. Because the Transfers were fraudulent under Ann. Cal. Civ. Code, § 3439.04(a)(1) and under California common law on fraudulent conveyances, the Receiver may avoid the Transfers, and any portion thereof which was subsequently transferred to Defendant Roca, pursuant to Ann. Cal. Civ. Code, §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent conveyance.

66. As a direct and proximate result of HW Credit's fraudulent Transfers to Defendant Bullion Investment Corporation, the Receivership Estate has been diminished in the amount of $1,107,630.80, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the HW Entities.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the HW Entities, respectfully requests that the Court enter judgment against Defendants:  (1) determining that the Transfers from HW Credit to Defendant Bullion Investment Corporation were fraudulent and avoiding those Transfers and any portion thereof which was subsequently transferred to Defendant Roca; (2) entering a money judgment against Defendants in the full amount of the Transfers to Defendant Bullion Investment Corporation and to Defendant Roca as subsequent transferee, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT II

### AGAINST ALL DEFENDANTS

### (Fraudulent Transfer under Ann. Cal. Civ. Code, §§ 3439.04(a)(2) and 3439.05)

67. Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

68. This is a claim to avoid and recover fraudulent transfers, pursuant to Ann. Cal. Civ. Code, §§ 3439.04(a)(2) and 3439.05.

69. As detailed above, HW Credit transferred $1,107,630.80 to Defendant Bullion Investment Corporation.

70. Defendant Bullion Investment Corporation received the Transfers in the total amount of $1,107,630.80 from HW Credit without providing reasonably equivalent value in exchange for the Transfers.

71. HW Entities had creditors whose claims arose before HW Credit made the Transfers to Defendant Bullion Investment Corporation.

72. HW Credit did not receive reasonably equivalent value in exchange for the Transfers to Defendant Bullion Investment Corporation, as detailed above. Indeed, Defendants have made no payments and provided no value to HW Credit or the Receivership Estate, and, thus, Defendants received a profit of $1,107,630.80 from HW Credit.

73. When HW Credit made the Transfers to Defendant Bullion Investment Corporation, the assets remaining in HW Credit's business were unreasonably small in relation to the business or transaction.

74. When HW Credit made the Transfers to Defendant Bullion Investment Corporation, HW Credit intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.

75. Upon information and belief, Defendant Bullion Investment Corporation subsequently transferred all or some of the Transfers to its President and shareholder Defendant Roca.

76. Because the Transfers are fraudulent under Ann. Cal. Civ. Code, §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the Transfers and any portion thereof subsequently transferred to Defendant Roca pursuant to Ann. Cal. Civ. Code, §§ 3439.07(a)(1) and 3439.08(b)(2).

77. As a direct and proximate result of HW Credit's fraudulent Transfers to Defendant Bullion Investment Corporation, the Receivership Estate has been diminished in the amount of $1,107,630.80 and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the HW Entities.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for HW Credit, respectfully requests the Court enter judgment against Defendants:  (1) determining that the Transfers from HW Credit to Defendant Bullion Investment Corporation were fraudulent and avoiding those Transfers and any portion thereof which was subsequently transferred to Defendant Roca; (2) entering a money judgment against Defendants in the full amount of the Transfers to Defendant Bullion Investment Corporation and to Defendant Roca as subsequent transferee, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT III

## AGAINST ALL DEFENDANTS

### (Unjust Enrichment as to the Transfers)

78. Plaintiff repeats and re-alleges and incorporate by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

79. HW Credit conferred a benefit on Defendants when it made the Transfers to Defendant Bullion Investment Corporation in the amount of $1,107,630.80, all of which were derived from the customers of the HW Entities.

80. Defendants had knowledge of the benefit they received from HW Credit as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

81. It is inherently unfair and inequitable that the funds of customers defrauded in HW Credit's fraudulent scheme are retained by and used to personally benefit Defendants, rather than being returned to the Receivership Estate for the benefit of all of the defrauded customers.

82. As a direct and proximate result of Defendants' retention of the $1,107,630.80 that HW Credit fraudulently transferred to Defendant Bullion Investment Corporation and which was subsequently transferred to Defendant Roca, the Receivership Estate has been diminished, and, under the circumstances, equity dictates that Defendants should return the funds they received from HW Credit, and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded customers.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for HW Credit, respectfully requests the Court enter judgment against Defendants: (1) determining that Defendants were unjustly enriched by virtue of their receipt of the Transfers from HW Credit as initial or subsequent transferees; (2) entering a money judgment against Defendants, in the full amount of the Transfers, and, if necessary, imposing a constructive trust and/or equitable lien on

the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

Dated: March 11, 2015.

Respectfully submitted,

**DAMIAN & VALORI, LLP**
*Counsel for Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile:   (305) 371-3965

*/s/ Kenneth Dante Murena*
KENNETH DANTE MURENA, P.A.
FLORIDA BAR NO. 147486